## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| U.S. ELECTRICAL SERVICES, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 12-10845-DJC** |
| | ) | |
| JAMES SCHMIDT, PETER COLON, and | ) | |
| MUNRO DISTRIBUTING CO., INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

### STATEMENT OF REASONS

**CASPER, J.**                                                                                    June 19, 2012

### I.    Introduction

Plaintiff U.S. Electrical Services, Inc. ("USESI") has sued its former employees, James

Schmidt ("Schmidt") and Peter Colon ("Colon"), and their current employer, Munro Distributing

Company, Inc. ("Munro") (collectively, "Defendants"), alleging breach of contract, breach of the

duty of loyalty, misappropriation of trade secrets, conversion, tortious interference with both

contractual relations and advantageous relations, unfair competition, and civil conspiracy.  USESI

moved for a preliminary injunction restricting the scope of Schmidt and Colon's work for Munro

and precluding Munro from competing with USESI for a particular piece of business (the "Dollar

Tree account" or "Dollar Tree") on which Schmidt and Colon had worked during their employment

at USESI.  After a hearing on May 14, 2012, the Court DENIED USESI's motion for a preliminary

injunction and informed counsel that a statement of reasons would follow.

1

## II.      Burden of Proof and Standard of Review

The burden of providing a factual basis sufficient to justify a preliminary injunction rests with the party seeking the injunction.  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).   Unless the parties' competing versions of events are "in sharp dispute such that the 'propriety of injunctive relief hinges on determinations of credibility,'" Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 117 (D. Mass. 2010) (quoting Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995)), the Court is free to accept as true "well-pleaded allegations [in the] complaint and uncontroverted affidavits." Id. at 114 n.2 (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)).  The Court must ensure that "given the nature and circumstances of the case . . . the parties have a fair opportunity to present relevant facts and arguments to the court, and to counter the[ir] opponent's submissions." Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988).

## III.      Factual Background

### A.      USESI

USESI is a Connecticut corporation with its principal place of business in Connecticut.  D. 1 at ¶ 1.[1]  USESI is a national distributor of electrical products and services.  D. 1 at ¶ 7.  USESI operates through a number of business units, subsidiaries and brand identities.  For example, Standard Electric Supply Company ("SESCO"), a distributor of electrical products and services, was merged into USESI on December 31, 2008, at which point USESI assumed all of SESCO's assets, liabilities, obligations and agreements but continued to do business under SESCO's brand name based out of SESCO's office in Wilmington, Massachusetts.  D. 1 at ¶¶ 7-8; Affidavit of SESCO

---

[1]References to docketed material are abbreviated as "D. __."

2

President Thaddeus Dlugolecki, D. 3-1 at ¶¶ 5-6. Electrical distributors distribute products and services such as lighting, fixtures, wiring, fuses and breakers, and switchgear; a typical "national account" for such a distributor is a large nationwide retail chain (such as Legal Sea Foods or Abercrombie & Fitch) that agrees to buy a set of electrical products exclusively from one distributor for a specific period of time, often two years or longer. Dlugolecki Aff., D. 3-1 at ¶¶ 10, 12. One of USESI's national accounts is the Dollar Tree account, which USESI successfully bid for in 2008. D. 1 at ¶ 79; Dlugolecki Aff., D. 3-1 at ¶ 38.

### B.    Munro

Munro is a Massachusetts corporation with a principal place of business in Fall River, Massachusetts. D. 1 at ¶ 4. Until recently, Munro was a regional distributor of electrical products, but by April 2012 it had opened a national accounts division in Wilmington, Massachusetts, less than one mile from SESCO's Wilmington office. Affidavit of Mary-Ellen Stahl ("Stahl"), SESCO's Human Resources Manager, D. 3-2 at ¶ 24; D. 1 at ¶ 19. Munro's national accounts division competes directly with USESI and USESI asserts that Munro intends to compete with USESI for the Dollar Tree account, which was scheduled to go out for bid for the first time in four years on or around May 16, 2012. D. 1 at ¶¶ 20, 80.

### C.    Schmidt

Schmidt is a New Hampshire resident who resides in Nashua, New Hampshire. D. 1 at ¶ 2. On August 1, 2007, Schmidt began working for SESCO as its Director of National Accounts. D. 1 at ¶ 23; Schmidt Aff., D. 11 at ¶ 3. In consideration for his position, he signed a Proprietary Information and Non-competition Agreement, which included the following clause:

> I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to

> disclose to any person, firm or corporation without written authorization of the
> Company, any Confidential Information of the Company. I understand that
> "Confidential Information" means any Company proprietary information, technical
> data, trade secrets or know-how including, but not limited to, research and
> development information, product plans, products, services, customer lists and
> customers (including, but not limited to, customers of the Company on whom I
> called or with whom I became acquainted during the term of my employment),
> suppliers, markets, software developments, inventions, processes, formulas,
> technology, designs, drawings, engineering information, hardware configuration
> information, marketing information, costs, pricing, finances or other business
> information disclosed to me by the Company either directly or indirectly in writing,
> orally or by drawings or inspection of parts or equipment. I further understand that
> Confidential Information does not include any of the foregoing items which has
> become publicly known or made generally available through no wrongful act of
> mine. I further agree that all Confidential Information shall at all times remain the
> property of the Company.

D. 3-3 at ¶ 1(a). The Agreement also included a non-competition and non-solicitation clause that restricted Schmidt's conduct for one year after the termination of his employment, including a one-year prohibition on recruiting USESI's employees away to another company. D. 3-3 at ¶¶ 4, 5(b).

After SESCO and USESI merged, Schmidt oversaw between fifteen and twenty of USESI's national accounts customers, including Dollar Tree Stores. Dlugolecki Aff., D. 3-1 at ¶ 36; D. 1 at ¶¶ 28-29. Schmidt was involved in SESCO's successful bid for the Dollar Tree account in 2008 and developed close relationships with Dollar Tree's employees and its general and electrical contractors. Dlugolecki Aff., D. 3-1 at ¶¶ 38, 45-46. Schmidt had a relationship with Dollar Tree prior to his employment with USESI and asserts that he "brought the Dollar Tree account over to USESI" when he began his employment in 2007. Schmidt Aff., D. 11 at ¶ 26.

Schmidt's working relationship with SESCO President Dlugolecki deteriorated and by April 2010 Schmidt began to complain to USESI management about Dlugolecki. Schmidt Aff., D. 11 at ¶ 4. On September 23, 2010, Schmidt terminated his employment with USESI and its SESCO brand and began working for Wiedenbach-Brown Co., Inc. ("Wiedenbach"), a distinct USESI subsidiary.

D. 1 at ¶¶ 36, 39; D. 3-4.  He signed a Separation Agreement and General Release with USESI that included a clause expressly activating the one-year non-competition and non-solicitation restrictions included in the 2007 Agreement.  Separation Agreement, D. 3-4 at ¶ 11.  Additionally, Wiedenbach asked Schmidt to sign a new Draft Employment Agreement that included non-solicitation clauses benefitting both Wiedenbach and its parent company USESI.  Schmidt Aff., D. 11 at ¶ 7; Draft Agreement, D. 11-1 at 3-4.  Schmidt refused to sign the Draft Agreement, negotiated a Final Agreement including narrower restrictive covenants that removed USESI as a beneficiary and signed the Final Agreement.  Schmidt Aff., D. 11 at ¶¶ 8-10; Final Agreement, D. 3-5.  The Final Agreement included a non-solicitation clause that restricted Schmidt's conduct for one year after the termination of his employment with Wiedenbach, including a prohibition on recruiting Wiedenbach's employees away to rival companies, Wiedenbach Agreement, D. 3-5 at ¶¶ 4-5, a confidentiality clause stating that Schmidt "will not, while employed by the Company or thereafter, directly or indirectly use, disclose or disseminate . . . any Confidential Information," D. 3-5 at ¶ 4, and a clause regarding "binding effect" that stated Wiedenbach "may assign its rights and obligations under this Agreement."  D. 3-5 at ¶ 15.

USESI asserts that on December 31, 2008, "SESCO was merged into USESI, and ceased to be a separate entity," and that "[t]he SESCO name continues to exist as a brand" but "USESI assumed all of SESCO's assets, liabilities, obligations and agreements with this merger."  Compl., D. 1 at ¶ 8.  Schmidt disputes whether there was any such merger, and asserts that Wiedenbach "was affiliated with USESI long before December 2011," noting that "USESI was the parent company for Wiedenbach" when Schmidt began working at Wiedenbach, that "[b]oth the CEO of USESI and the President of Wiedenbach-Brown sit on the Board of Directors for USESI and have done so since

USESI purchased Wiedenbach-Brown in 2006" and that "the insurance plan and 401K plans at Wiedenbach-Brown were both under the USESI name."  Schmidt Aff., D. 11 at ¶ 15.  Schmidt also disputes USESI's assertion that after December 2011 Wiedenbach was merely a separate USESI brand name like SESCO, stating that "[f]rom the day I started at Wiedenbach-Brown through my resignation date, Wiedenbach-Brown operated its own sales force, distribution center, IT department, purchasing department, phone systems, and payroll provider," and that "in December 2011, there was no internal announcement regarding [a] merger, nor am I aware of any public relations announcement, industry announcement, or other announcement that would typically accompany a merger" and "my paychecks before the alleged merger contained the exact same company name (Wiedenbach-Brown) as after the alleged merger."  D. 11 at ¶ 16.

After leaving SESCO for Wiedenbach in 2010, Schmidt had no interaction with any of USESI's non-Wiedenbach clients, including Dollar Tree.  Schmidt Aff., D. 11 at ¶ 17.[2]  On March 19, 2012, Schmidt resigned from Wiedenbach.  D. 1 at ¶ 65.  He had not provided advance notice of his resignation.  D. 1 at ¶ 66.  Schmidt subsequently accepted a position with Munro as its Vice President of National Accounts.  D. 1 at ¶ 67; Melnick Aff., D. 3-12 at ¶¶ 3-4; Schmidt Aff., D. 11 at ¶ 29.  Schmidt asserts that he neither possesses nor recalls any Dollar Tree information alleged by USESI to be confidential.  D. 11 at ¶¶ 19, 23.

### D.     Colon

---

[2] SESCO Power Distribution and National Accounts Operations Manager David Ward ("Ward") asserts that "[t]he prices for 95% of the products [SESCO] ha[s] sold to Dollar Tree have remained the same since 2010," with the exception of prices for lamps, "because there was a worldwide shortage of rare metal earth material that is used in florescent lamps." Supplemental Ward Declaration, D. 17 at ¶ 7.

Colon is a Massachusetts resident who resides in Tewksbury, Massachusetts.  D. 1 at ¶ 3.

In 2008, Colon began working for SESCO as a Lighting Project Coordinator.  D. 1 at ¶ 42; Affidavit

of SESCO Power Distribution and National Accounts Operations Manager David Ward, D. 3-11 at

¶¶ 3, 5; Colon Aff., D. 12 at ¶ 3.  On March 3, 2008, in consideration of his continued employment

with SESCO, Colon signed a Confidentiality Agreement agreeing not to use or disseminate any of

SESCO's confidential information "at any time during my employment or after the termination of

my employment, unless SESCO expressly consents beforehand in writing," Confidentiality

Agreement, D. 3-6 at 1, agreeing that "my obligations under this Agreement shall continue after

termination of my employment with SESCO," D. 3-6 at 3, and agreeing that the Agreement "shall

inure to the benefit of SESCO, its successors, assigns, nominees and designees."  D. 3-6 at 3.

Colon was the sole Lighting Project Manager assigned to the Dollar Tree national account

and his entire day-to-day focus involved servicing Dollar Tree and its electrical product needs, tasks

that, according to Colon's supervisor, David Ward ("Ward"), required constant use of USESI's cost

and pricing information specific to the Dollar Tree account and the development of close

relationships with Dollar Tree's general and electrical contractors and its purchasing and project

management employees.  Ward Aff., D. 3-11 at ¶¶ 5-11.  Colon describes his duties as "working

with warehouse personnel to get orders out, downloading plans from Dollar Tree's website, and

handling project orders," and notes that while he did communicate with Dollar Tree with some

frequency, he "only communicated with field project management personnel," he "never dealt with

any officers, directors or decisionmakers at Dollar Tree," and he "had absolutely no influence

regarding pricing or product information."  Colon Aff., D. 12 at ¶ 4.

USESI asserts that both before and after USESI's merger with SESCO, Colon was the

custodian of the Dollar Tree "paper file," which included all of USESI's Dollar Tree cost information and pricing data, and which Colon kept in a drawer in his desk at SESCO's Wilmington office. Compl., D. 1 at ¶ 50; Ward Aff., D. 3-11 at ¶ 13.

In September 2011, Colon sought and received SESCO's permission to alter his work schedule to address childcare issues. Colon Aff., D. 12 at ¶ 6. Colon's working schedule at SESCO permitted him to work from home during regular office hours and to come into the office to work at night and on weekends. Affidavit of Kathleen Winn ("Winn"), Former USESI Project Manager and Current Munro Employee, D. 10 at ¶ 3; Colon Aff., D. 12 at ¶ 6. Accordingly, Colon kept what he describes as "unusual hours at the office." D. 12 at ¶ 6.

At 11:20 p.m. on the night of Sunday, March 18, Colon resigned from SESCO via an e-mailed sent to Ward and Mary-Ellen Stahl ("Stahl"), SESCO's Human Resources Manager. D. 3-7 at 1. He explained that he had "accepted a position with another company better suited for me and my family." D. 3-7 at 1. USESI alleges that prior to this e-mail, Colon had not informed anyone at SESCO or USESI that he was considering resigning. D. 1 at ¶ 58; Stahl Aff., D. 3-2 at ¶ 16; Ward Aff., D. 3-11 at ¶ 17. Stahl spoke with Colon later that week, on March 23, 2012, and alleges he told her that, contrary to the statements made in his resignation e-mail, he was not currently employed, and that he "was looking at possibilities for work" but "that wouldn't happen for a while." D. 3-2 at ¶ 26. USESI alleges that in fact, Colon had by that time already obtained a position with Munro. D. 1 at ¶ 59; see also Melnick Aff., D. 3-12 at ¶ 6.

Surveillance cameras in SESCO's Wilmington office captured a series of images of Colon in the days leading up to his resignation. According to these images and their various date- and time-stamps, Colon can be seen near the entry of the SESCO office at 11:23 p.m. on Thursday,

March 15, 2012, with an armful of papers.  D. 3-8 at 1-6.  On Saturday, March 17, 2012, at 2:12

p.m., Colon again can be seen near the entry of the SESCO office with an armful of papers.  D. 3-9

at 1-4.  On Sunday, March 18, Colon can be seen carrying a box near the entry of the SESCO office

at 2:43 p.m., standing near the entrance at 2:59 p.m., and carrying a small handful of papers in the

office stairwell at 6:38 p.m.  D. 3-10 at 1-6.  USESI asserts that no one other than Colon was in

SESCO's Wilmington office on the night of March 17 or the weekend of March 17 and 18.  Stahl

Aff., D. 3-2 at ¶ 24.

Colon states that the photographs from Thursday, March 15 and Saturday, March 17 "show

me taking papers to and from the office, which I had permission to do since I was working from

home," and asserts that "if USESI were to pull photographs from the surveillance video for earlier

weeks, the pictures would look almost identical to those" provided by USESI to the Court.  Colon

Aff., D. 12 at ¶ 8.  He also states that on Sunday, March 18, after he decided to resign from SESCO,

Colon began bringing papers that he had been working on at home back into the office, and began

removing personal belongings that had accumulated at the office over the four years he had worked

at SESCO, because he "had personally observed that, when others at USESI chose to resign, they

were immediately escorted from the building in front of their co-workers and told to return after

hours to pick up their personal belongings," and "I did not want to be humiliated in this fashion, nor

did I want to engage in any negotiations with USESI about staying."  D. 12 at ¶¶ 9-10.

After Colon's resignation, SESCO assigned a new employee to handle the Dollar Tree

account.  D. 1 at 60.  USESI alleges that a few days after Colon's resignation, the new employee

discovered that a number of folders and documents were missing from the Dollar Tree account paper

file, including papers that list manufacture purchase costs for the Dollar Tree account and SESCO's

sales prices to Dollar Tree, from Colon's desk.  D. 1 at ¶ 60; Stahl Aff., D. 3-2 at ¶ 19.  Specifically, the alleged missing documents were resale pricing lists for panelboards (a type of electrical product), plans detailing panelboard layouts for Dollar Tree, cost price lists for fuses, the cost multipliers for panelboards produced by a specific manufacturer, the rebates provided to USESI by a different manufacturer for the Dollar Tree account, the net rebate pricing for a third manufacturer's products when used for the Dollar Tree account, the prices charged to USESI by a fourth manufacturer for occupancy sensors for the Dollar Tree account, the prices charged to USESI by a fifth manufacturer for its products when used for the Dollar Tree account, and the full list of sales prices from USESI to Dollar Tree.  Ward Aff., D. 3-11 at ¶ 20.  These documents could not be found anywhere else in the Wilmington Office.  D. 3-2 at ¶ 19.  USESI asserts that it has been unable to determine who, other than Colon, could have removed the documents from the Dollar Tree file.  D. 3-2 at ¶ 25.[3]

The Defendants assert that USESI is mistaken, that USESI never created or maintained paper files with pricing, rebates, multipliers or marketing funds from vendors, and that because this information is updated frequently and must be shared with multiple USESI employees working on any given account, such information is instead maintained in an electronic file on a shared drive.  Winn Aff., D. 10 at ¶ 6.  Specifically, Colon asserts that although he "had access to [Dollar Tree's] bill of material, which I put together for each project and then uploaded to Dollar Tree's website," he "had limited exposure to pricing information," any of which "would have been for unit prices

---

[3] On March 23, 2012, counsel for USESI sent Colon a letter indicating that USESI had surveillance camera footage showing Colon leaving the SESCO office with boxes and files and asking Colon him to either return any confidential USESI documents in his possession or to certify to USESI that he did not have any USESI property.  Letter to Colon, D. 3-15 at 1-2.  On April 2, 2012 Colon completed the certification proposed by USESI and returned it to USESI.  Certification, D. 12-2.

only," and he "did not have information regarding total profit margins, rebates, marketing funds, multipliers or other items that dictated profit margin." Colon Aff., D. 12 at ¶ 5. Colon specifically denies having possession of any of the documents enumerated by Ward, and asserts that he "do[es] not believe the information listed in Mr. Ward's affidavit was ever included in any paper file," since "rebate information and cost multiplier [information] . . . is only shared with employees who need to know this information (i.e., Sr. Management)," and "any unit pricing information I had was kept in an electronic file for the Dollar Tree account." D. 12 at ¶ 15.[4] Colon also asserts that "through counsel, I offered to assist USESI with finding any documents the company believes to be missing," but "I never received a telephone call or any further correspondence asking me to assist in locating these documents." D. 12 at ¶ 16. Additionally, Colon denies having any recollection of the information enumerated by Ward. D. 12 at ¶ 20.

USESI alleges that Schmidt solicited Colon and one other USESI employee to leave USESI and work for Munro. D. 1 at ¶¶ 69, 73; Stahl Aff., D. 3-2 at ¶ 29. USESI also alleges that prior to his resignation Colon knew that Dollar Tree planned to send its national account out to bid for the first time in four years, that in January 2012 he told two SESCO warehouse employees that he had this knowledge, but that he did not inform anyone in SESCO or USESI management that the Dollar Tree account was going out to bid. Ward Aff., D. 3-11 at ¶¶ 23-27; Declaration of Kenneth Ducharme, SESCO Warehouse Associate, D. 18 at ¶ 4. Colon disputes this, stating that he "did not know the Dollar Tree account would be going up for bid before others at USESI," and asserting that "David Ward, the very person who now accuses me of withholding this information, received an e-

_____

[4]Ward has submitted to the Court copies of e-mails sent by Ward to Colon discussing Dollar Tree unit pricing. Supplemental Ward Declaration, D. 17.

mail on March 16, 2012 from . . . Dollar Tree stating that [a specific] portion of the Dollar Tree

account was going out to bid.  Mr. Ward sent me a copy of this e-mail to alert me of the news, which

is how I first found out that a portion of the Dollar Tree account was going up for bid."  Colon Aff.,

D. 12 at ¶ 17.

## IV.    Procedural History

On May 9, 2012, USESI filed both its complaint in this action and the instant motion for a

preliminary injunction.  D. 1, 2.  The Court scheduled argument on an expedited basis for May 14,

2012.  D. entry for 5/10/12.  Defendants filed their opposition on May 11, 2012.  D. 8.  USESI filed

supplemental declaration in support of its motion on the morning of May 14, 2012; the Court held

a hearing later that afternoon.  The Court denied USESI's motion and notified the parties that it

would issue a full statement of reasons.  D. entry for 5/14/2012.

## V.    Discussion

To obtain a preliminary injunction, USESI "bear[s] the burden of demonstrating (1) a

substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the

injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between

the injunction and the public interest."  Nieves-Marquez, 353 F.3d at 120 (1st Cir. 2003).  "The *sine*

*qua non* of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot

demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle

curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

### A.  Likelihood of Success on the Merits

In support of its preliminary injunction motion, USESI focused on the merits of only two

subsets of the allegations in its complaint:  first, allegations that Schmidt will violate his

confidentiality obligations to USESI because he will inevitably use or disclose USESI's confidential information as part of his work with Munro, in violation of his common-law obligations regarding trade secrets and his parallel statutory obligations, Mass. Gen. L. c. 93, § 42, as set forth in Count VI of USESI's complaint, and second, allegations that Colon physically took USESI's trade secret files and will inevitably use the information in those files to assist Munro, in violation of his common-law obligations regarding trade secrets and his parallel Mass. Gen. L. c. 93, § 42 obligations as set forth in Count VII and in violation of the prohibition against conversion as set forth at Count VIII.[5]  As discussed below, at this early stage of the instant litigation, USESI has failed to show a likelihood of success on the merits as to these allegations against Schmidt and Colon.

### A.     Schmidt

USESI has not attempted to show that Schmidt has actually disclosed any of USESI's confidential information regarding the Dollar Tree account to Munro or that he has actually used such information on Munro's behalf.  Instead, USESI argues that during the course of his employment at Munro, including but not limited to Munro's pursuit of the Dollar Tree account, Schmidt "will inevitably draw upon the confidential information [he] learned at USESI" that he "retains in his memory," Pl. Memo, D. 3 at 13, and cites a series of cases from this district dealing

---

[5]Although there are other claims in the complaint, USESI argued that, at least for the purposes of the preliminary injunction proceedings, the analysis for breach of contract with regard to confidentiality, breach of a common law duty of confidentiality, violation of statutory trade secrets obligations, and violations of common law trade secrets claim should be identical and should turn solely on whether Schmidt and Colon misused USESI's trade secrets.  Similarly, although in its brief in support of its motion for a preliminary injunction, USESI discussed its claim that Schmidt violated his non-solicitation obligations to USESI, at oral argument counsel for USESI expressly disclaimed that issue for the purpose of the preliminary injunction proceedings, opting to focus exclusively on Schmidt and Colon's confidentiality obligations.

with the so-called "inevitable disclosure" doctrine, such as <u>Marcam Corp. v. Orchard</u>, 885 F. Supp. 294 (D. Mass. 1995), <u>Lombard Medical Techs., Inc. v. Johannessen</u>, 729 F.Supp.2d 432 (D. Mass. 2010), and <u>Aspect Software, Inc. v. Barnett</u>, 787 F. Supp. 2d 118 (D. Mass. 2011), as well as cases such as <u>Jet Spray Cooler, Inc. v. Crampton</u>, 361 Mass. 835 (1972), and <u>Boulanger v. Dunkin' Donuts Inc.</u>, 442 Mass. 635 (2004), where a plaintiff alleges that its employee jeopardized trade secrets not by absconding with files or paper documents but rather by relying on his or her own memory and knowledge acquired during previous employment to assist a new employer.  However, reliance on the "inevitable disclosure" doctrine is unavailing here for two reasons.

       1.  Reliance on Inevitable Disclosure to Show Likelihood of Success on the Merits

First, none of the authorities cited by USESI stand for the proposition that allegedly inevitable future misuse of trade secrets is by itself sufficient to establish a violation of either common law  or statutory obligations regarding trade secrets.  In <u>Jet Spray Cooler</u>, for example, the Supreme Judicial Court noted that a special master initially presiding over the case on behalf of the trial court had found that the four employees named as defendants in the case had in fact "utilized all of the information and knowledge which they had acquired while working for the plaintiffs," <u>Jet Spray Cooler</u>, 361 Mass. at 838; <u>see id.</u> at 842 (enumerating the types of "information obtained by the four individual defendants in the course of their employment with the plaintiffs and later used by them in their operations" at their new place of employment).  The dispute before the court was not over whether future disclosures were inevitable but rather over whether already-disclosed information, derived not from any stolen or ill-gotten files but rather derived solely from the defendants' memories, could qualify as a confidential trade secret protected by the common law. <u>Id.</u> at 839-43.  The Supreme Judicial Court held that it could – "the fact that no list or paper was

taken does not prevent the former employee from being enjoined if the information which he gained through his employment and retained in his memory is confidential in nature," id. at 840 – but liability in the case was clearly based on actual, not future, misuse of trade secrets. Id. at 835-38, 842-44.

Similarly, in Boulanger, the Supreme Judicial Court held that non-compete covenants and corporate confidentiality policies are enforceable when they are memorialized in franchise agreements (as opposed to employment contracts), Boulanger, 442 Mass. at 635-36; the Court mentioned in a footnote that defendant Dunkin' Donuts' non-competition agreements may serve confidentiality interests that confidentiality agreements on their own are unable to protect, because "working for the competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove," id. at 643 n.12, but did not suggest that an allegedly inevitable future breach of confidentiality obligations is by itself sufficient to establish liability before the breach actually occurs.

Marcam, Lombard, and Aspect, each of which is discussed in more detail below, are more apposite; each directly addresses the notion of future inevitable disclosure and, like the instant case, each arose in the preliminary injunction context. Marcam, 885 F.Supp. at 295; Lombard, 729 F. Supp. 2d at 435; Aspect, 787 F. Supp. 2d at 121. However, in each case, the plaintiff established the likelihood of success on the merits of a breach of contract claim based on a non-competition agreement, not (as here) a pure trade secrets claim, and in each case the plaintiff alleged that the defendant's breach had already occurred by the time of the preliminary injunction proceedings, not (as here) merely that the defendant's actionable conduct was imminent and inevitable. Marcam, 885 F.Supp. at 298-99; Lombard, 729 F. Supp. 2d at 438-41; Aspect, 787 F. Supp. 2d at 127-130. The

15

three cases each discussed inevitable disclosure only in the context of establishing irreparable harm. Marcam, 885 F. Supp. at 297-98; Lombard, 729 F. Supp. 2d at 441-42; Aspect, 787 F. Supp. 2d at 130-31.[6] Accordingly, although the cases offered by USESI make clear that the inevitable disclosure doctrine may be used to establish irreparable harm once a party seeking an injunction has already established a likelihood of success on the merits, they do not show that a party may rely solely on inevitable future conduct, rather than conduct that has actually occurred, to establish a likelihood of success on the merits of a trade secrets appropriation claim or a breach of confidentiality claim, as USESI seeks to do here.

### 2.  Applying the Inevitable Disclosure Doctrine to the Facts of This Case

Second, even if the inevitable disclosure doctrine could provide a basis for demonstrating a likelihood of success on the merits, rather than for showing a likelihood of irreparable harm after the likelihood of success has already been established, cases in which judges in this district have found future disclosure inevitable are clearly distinct from the case at hand.  For example, in Marcam, a software company, Marcam, sued its former Vice-President of Development, defendant

---

[6] Another "inevitable disclosure" case relevant to USESI's position, C.R. Bard, Inc. v. Intoccia, Case No. 94-CV-11568, 1994 WL 601944 (D. Mass. Oct. 12, 1994), discusses inevitable disclosure without relying on such disclosures to establish a breach of confidentiality obligations.  Bard involved a non-compete agreement that included a mechanism for plaintiff Bard to "consent to employment of a former employee by a competitor under certain circumstances," wherein "[u]pon receiving assurances by the competitor that the employee will not engage in activity competitive with Bard, the latter may not unreasonably withhold such consent."  Bard, 1994 WL 601944, at *3.  The parties in Bard agreed that the defendant had accepted new employment without Bard's consent, but they disputed whether Bard's refusal to consent was reasonable; the Court held that it was, in part because the defendant would "inevitably draw upon that knowledge [of Bard's operation]."  Id.  Accordingly, although Bard considered alleged inevitable disclosures outside of the irreparable harm context, it – like Marcam, Lombard and Aspect – relied only on past conduct (the defendant's new employment) to establish the breach of contract at issue and relied on future conduct (the alleged inevitable disclosure) only to determine whether the plaintiff would be harmed by the breach.  Id.

Orchard, and sought a preliminary injunction enforcing his non-compete and non-disclosure agreement before he went to work for a rival, Datalogix, which was building software products designed to be directly competitive with a new product Marcam had spent fourteen months developing and marketing.  Marcam, 885 F.Supp. at 296.  The Court issued the preliminary injunction, noting in its discussion of irreparable harm that Orchard, in his role at Marcam, was "directly responsible for the research and development" of Marcam's new product, "and was involved in all other significant aspects of the product, including budget and marketing decisions," and further was responsible for "approximately sixty employees in the areas of product development, product assurance, and technical consulting with respect to several" aspects of the new product, and for over three years he "was privy to top-level discussions concerning Marcam's research and development efforts pertaining to its current products, as well as its future products," providing him with "an intimate understanding of Marcam's plans for future development and of its sales and marketing strategies." Id.  Here, USESI has not shown that Schmidt's knowledge and level of responsibility with regard to the USESI's handling of the Dollar Tree account is remotely comparable to Orchard's with regard to the project at issue in Marcam.  Schmidt has not dealt with the Dollar Tree account (or any other non-Wiedenbach USESI account) for over two years, his relationship to the Dollar Tree account does not appear to have been nearly as comprehensive as Orchard's relationship to the new product at issue in Marcam, and, at least based on the showing made by USESI at this preliminary stage of the litigation, Schmidt lacked the intimate understanding of USESI's future specific plans and strategies  that was central to the analysis in Marcam.

Marcam cited with approval C.R. Bard, Inc., 1994 WL 601944, see Marcam, 885 F.Supp. at *297.  In Bard, the court granted a preliminary injunction in favor of a medical device

manufacturer and distributor, Bard, which sought to enforce confidentiality and non-competition agreements with a former employee, Intoccia, before he went to work for Minntech, a rival company that had previously been business partners with Bard. Bard, 1994 WL 601994 at *1-*2. In the original business arrangement between Bard and Minntech, Bard marketed and distributed a cardiopulmonary hollow fiber membrane oxygenator developed and manufactured by Minntech, and the two companies split the resulting profits. Id. at *1. Subsequently, unbeknownst to Minntech, Bard decided to develop its own hollow fiber membrane oxygenator and related products. Id. "[I]n great secrecy Bard embarked upon market and later technical research under the code name 'Blackstone Project,'" id., and assigned Intoccia to manage the secret project. Id. at *2. In that capacity, he was charged with "proposing and developing the business and project plans for the Bard oxygenator and managing the sixteen people supporting this development," as well as "serv[ing] as a member of [Bard's] Cardiopulmonary Division's Management Board," where "[h]e was . . . privy to all strategic, marketing and technical knowledge of Bard" and its various cardiopulmonary projects. Id. Bard assigned the Blackstone project a $3 million budget and a timeline of three years to develop a marketable oxygenator. Id. at *1. Two years and $2 million later, Minntech hired away Intoccia to supervise the marketing of its existing products and to develop a business plan for products to be introduced in the next few years, including a new Minntech oxygenator that would compete with Bard's still-secret, in-development oxygenator, possibly in the marketplace and at the very least "in a race for the development and Federal Drug Administration approval of the next generation of oxygenators." Id. at *2. The Court granted the motion, noting in its discussion of irreparable harm that:

> Bard has so far spent over $2 million and two years developing a product that, it hopes, will be sold at a highly competitive price and will satisfy [its] customers . .

18

> . . Defendant had detailed knowledge of all phases of Bard's development and
> marketing strategy.  Although I fully credit his testimony that he took no documents
> that could in any way compromise the plaintiff, he could not and did not leave
> behind his special knowledge of plaintiff's operation, and in serving his new
> employer he will inevitably draw upon that knowledge.

Id. at *3.  Here, Schmidt was not responsible for a secret USESI project specifically hidden from

Munro, the existence of which he would be unable to simply forget or ignore upon beginning his

employment with Munro.  Nor did Schmidt have comprehensive control and intimate knowledge

of the Dollar Tree account in a degree similar to Intoccia's control and knowledge of Bard's secret

Blackstone project.

USESI also cites to Lombard, a case in which Lombard, a medical device company that had

spent 12 years and roughly $85 million developing an endovascular stent graft, hired two individuals

to coordinate the "competitive and resource-intensive process" of persuading medical centers to

participate in the clinical trials necessary for the graft to receive FDA approval, Lombard, 729 F.

Supp. 2d at 435, and then sued those two individuals when, despite the non-competition agreements

in their employment contracts, they were hired away to manage clinical field trials for TriVascular,

a rival endovascular stent graft manufacturer.  Id. at 435-36.  While still employed at Lombard, the

two individuals were responsible for "identifying medical centers to participate [in the clinical

trials], persuading them to refer patients to the clinical trials, meeting with doctors to discuss

[Lombard's new stent graft] and to evaluate its strengths and weaknesses, and participating in

weekly conference calls with Lombard's business, marketing, regulatory, and clinical personnel."

Id. at 435.  Because the two employees were the only individuals responsible for promoting the

clinical trials, they were essentially "the public face of Lombard."  Id.  In the course of their work

at Lombard, the two employees "became familiar with Lombard's confidential information,

including its technology, trade secrets, marketing plans, pricing data, non-public clinical trial data, information about the strengths and weaknesses of [Lombard's new stent graft], clinical trial design, agreements with medical centers, and contacts with key decisionmakers at medical centers," and Lombard helped the two employees "to develop contacts and relationships with medical centers for the [new stent graft] clinical trials." Id. at 435-36.  The Court preliminarily enjoined the two employees from working for their new employer for six months, and in its discussion of irreparable harm, it noted that the two employees "are intimately familiar with the weaknesses in [Lombard's new stent graft], have extensive contacts at medical centers through Lombard, and are knowledgeable about Lombard's non-public clinical trial analyses" and that "[e]ven if they fully intend to protect Lombard's confidential information, they do not begin at TriVascular with 'a tabula rasa . . . .'" Id. at 442 (quoting Marcam, 885 F.Supp. at 297).  Here, Schmidt does not have nearly the same intimacy or level of control with regard to the Dollar Tree account that the employees in Lombard had with the clinical trials under their management.

Finally, USESI points to Aspect, recently decided by this Court.  In that case, plaintiff Aspect Software, a company that develops, licenses and sells customer contact center products and services, sued to prevent defendant Barnett, who served as Aspect's executive vice president of research and development, chief technology officer, and executive vice president of global support, from leaving to join Aspect's rival Avaya as the vice president and general manager of Avaya's contact center business unit.  Aspect, 787 F. Supp. 2d at 122-23.  At Aspect, Barnett "was responsible for managing all aspects of the customer contact center business, including software and hardware development, technology standards, employee recruitment and retention, and customer relations, as well as general strategic and business management with regard to the customer contact center

business," id. at 122, and he had access to thirteen separate categories of information described by Aspect as trade secrets as well as wide-ranging authority in the company.  Id. at 123.  After the Court concluded that by accepting employment at Avaya Barnett was likely in breach of his non-compete agreement with Aspect, id. at 127-130, it discussed whether Barnett's likely breach would cause irreparable harm; despite "credit[ing] the sincerity of Barnett and Avaya's intent and the scrupulousness of their efforts" to protect Aspect's trade secrets, held that "given the extent of Barnett's experience at Aspect and the similarity between his positions at Aspect and at Avaya," disclosure was inevitable.  Id. at 130.  Here, again, Schmidt does not have nearly the same intimacy or level of control with regard to the Dollar Tree account that Barnett had with Aspect's customer call center business.

All in all, the instant case is unlike the facts in Marcam, Bard, Lombard, and Aspect.  Here, because Schmidt had only limited control over and intimacy with the Dollar Tree account, and because the information Schmidt may remember about the Dollar Tree account is stale by at least two years, it is not at all clear that USESI would suffer irreparable harm even if Schmidt were to disclose the information he remembers about the Dollar Tree account to his new employer.

### B.    Colon

USESI raises identical "inevitable disclosure" arguments against Colon and argues further that the camera images of Colon leaving USESI offices with boxes and files establish a likelihood of success on the merits of its conversion claim against Colon set forth in Count VIII (claim for conversion) of USESI's complaint.  USESI argues that the camera images of Colon, and the timing of those images in relation to the timing of his departure from USESI, are quite damning.  However, in light of Colon's affidavit explaining his conduct, D. 12, and the corroboration provided in the

Winn Affidavit, D. 10, the Court is left with two conflicting, thoroughly plausible explanations for the images.  As counsel for USESI conceded at oral argument, the only way to conclude that there is a likelihood of success on the merits as to the conversion claim is to discredit the Colon affidavit and the positions espoused therein.  At this early stage of the proceedings, with nothing but a paper record available to weigh credibility,[7] the Court cannot conclude that USESI is likely to prevail on the merits of its conversion claim.

Nor can the Court conclude at this stage that USESI is likely to prevail on the merits of any of its various claims against Colon predicated on an "inevitable disclosure" theory; the Court's reasoning with regard to such an argument regarding Schmidt discussed above applies with extra force to Colon.  Although Colon had worked with the Dollar Tree account more recently than Schmidt had, Colon had less authority than Schmidt with regard to the Dollar Tree account (and to accounts generally) and he had less intimate knowledge of the relevant aspects of the Dollar Tree

---

[7] Even where preliminary injunctive proceedings implicate credibility determinations, courts "need not engage in 'a full evidentiary hearing conducted in open court' [as long as they] offer the parties 'a reasonable opportunity to put forth, and to oppose, the disputed evidence,'" Campbell Soup, 47 F. 3d at 470-71 (quoting Schulz v. Williams, 38 F.3d 657, 658 (2d Cir. 1994) (per curiam)).  Courts must "balanc[e] between speed and practicality versus accuracy and fairness" when determining whether to proceed on the basis of affidavits and proffers rather than on live testimony.  Jackson v. Fair, 846 F.2d 811, 819 (1st Cir. 1988).  Here, USESI's complaint and motion for injunctive relief was filed on May 9, 2012, and the latter sought to enjoin conduct that was due to occur only five business days later, on May 16, 2012, making speedy resolution of the motion imperative.  Although counsel for USESI at the hearing at one point disputed the credibility of an affidavit submitted by Colon, neither USESI nor the Defendants sought an evidentiary hearing.  Prior to the hearing the Court reviewed USESI's complaint and the four exhibits attached thereto, D. 1, 1-1 and 1-4, USESI's brief and the six supporting affidavits or declarations and various exhibits attached thereto, D. 3, 3-1–3-15, 17, 18, and the Defendants' brief and four supporting affidavits, D. 8, 9, 10, 11, 12.  In light of the parties' filings and arguments, and the relatively minor part that the credibility of Colon's affidavit played in resolving USESI's motion, the Court was content to accede to the parties' willingness to proceed on the basis of affidavits rather than live testimony.

account that Schmidt did and, accordingly, the inevitable disclosure doctrine does not suggest that his actions amount to irreparable harm.  Moreover, even if inevitable disclosure could provide a basis for establishing a likelihood of success on the merits as a general matter, it would not do so here as to Colon.

For all these reasons, the Court was unable to conclude that USESI was likely to prevail on the merits of its claims.  Because likelihood of success on the merits is a key factor, the absence of which precludes preliminary injunctive relief, the Court need not discuss the remaining factors of the likelihood of irreparable harm (to any greater extent than it is discussed above), balance of the equities, or whether the requested injunctive action would comport with the public interest.  New Comm Wireless Servs., Inc., 287 F.3d at 9.

## VI.    Conclusion

For the reasons discussed above, the Court has DENIED USESI's motion for a preliminary injunction.

/s/ Denise J. Casper
United States District Judge